Filed 4/2/15  In re Mh. R. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Mh.R. et al., Persons Coming Under the Juvenile Court Law. | B255282<br>(Los Angeles County<br>Super. Ct. No. CK84335) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>H.R. et al.,<br><br>Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Carlos E. Vazquez, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant H.R.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant C.P.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

C.P. (mother) and H.R. (father) appeal from the juvenile court's dispositional order. Mother contends substantial evidence did not support the court's order denying her reunification services for the children, Mh.R. and Ma.R. Father contends the juvenile court denied him due process by conducting the jurisdictional hearing in his absence and failing to appoint an attorney to represent him at the dispositional hearing, for which he waived his physical presence. We affirm.

**FACTS AND PROCEDURE**

Mother has two older (but still quite young) children who are not the subjects of this appeal, Ds.C. and Dz.P. To a large extent, the circumstances regarding them are relevant. Dz. and Ds. do not share the same father with Mh. and Ma. There were three substantiated referrals in August and September 2010 relating to Dz. and Ds. The referrals alleged mother locked one-year-old Dz. in the bedroom, did not provide diapers for the girls or did not change their diapers, and did not feed them. The girls were suffering from failure to thrive. In December 2010, the court sustained a petition as to Dz. and Ds. alleging mother engaged in domestic violence in their presence and severely neglected them. Mother had willfully withheld and failed to provide adequate food over a prolonged period, and the home was found to be in a "filthy" condition. Dz. and Ds. suffered from malnourishment, dehydration, severe diaper rash, and environmental deprivation. The sustained petition also alleged mother suffered from mental illness and was unable to care for the children. The court ordered suitable placement for Dz. and Ds. in 2010. In October 2012, Dz. and Ds. were placed in mother's home with family maintenance services.

In January 2012, the court sustained a petition as to Mh. alleging mother had willfully withheld and failed to provide the child's half sibling, Ds., with adequate food over a prolonged period of time. In March 2012, the court ordered Mh. placed in mother's home under the supervision of the Los Angeles County Department of Children and Family Services (DCFS).

2

In January 2013, DCFS received a substantiated referral of general neglect of Mh. by mother. Mother would not cooperate and would not agree to voluntary family maintenance services.

DCFS filed the original petition at issue in this appeal in August 2013, under Welfare and Institutions Code section 300,[1] subdivisions (a), (b), and (j). Mh. was one year 10 months old, and Ma. was eight months old. Dz. and Ds. were four years old and three years old at the time, respectively. The petition alleged mother physically abused the children's half siblings, Ds. and Dz., left Mh. without any adult supervision, and maintained their home in an extremely unsanitary condition. (DCFS also filed a subsequent petition under section 342[2] as to Dz. and Ds.) The referral alleged the home was dirty and infested with roaches; mother had the children sleeping on urine-soaked mattresses; the children were unclothed; and mother may not have been feeding the children regularly. A separate referral around the same time alleged mother had a medical emergency and left the children with a neighbor who had an open dependency case and whose children had been removed for physical abuse.

DCFS interviewed mother's life skills coach James Evans from Life Walk Services, which she attended through the South Central Los Angeles Regional Center. Evans characterized mother as "lazy." Mother had a history of not making herself available for appointments. He was concerned about the children because the carpet was always dirty, they walked around in soiled diapers often, and most of the time they did not appear to be clean. When he was at the home recently he noticed a dresser blocking the door to the children's room such that they could not get out. He

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

[2] Section 342 states: "In any case in which a minor has been found to be a person described by Section 300 and the petitioner alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300, the petitioner shall file a subsequent petition."

told mother she could not lock them in the room and moved the dresser. He had heard mother talk "bad" to the children, telling them things like, "sit the Fuck down and that they are going to get their ass kicked." He had also seen mother leave the children alone in the courtyard of the apartment complex while she left to get something to eat. Mother received 50 hours of services a week with Life Walk Services, including life counseling and in-home parenting counseling.

Evans was at mother's home when the assistant for Dz. and Ds.'s counsel came to the home on August 6, 2013. The assistant was pleasant to mother, but when she asked mother about the urine smell, why the children were unclothed, and why the children's mattresses were on the floor, mother "cursed the assistant out, call[ing] her 'White bitch" and [telling] her to 'Get the fuck out of her house.'" The assistant was trying to work with mother, but mother was "out of control," and the assistant left. The assistant reported mother had left the children with a neighbor who was a registered sex offender and had a house arrest ankle bracelet. She also reported that she noticed holes in the wall of mother's apartment, and when she asked Dz. how they got there, Dz. said, "My mom did that with the rocking horse when I would not put my toys away."

Evans and the assistant were talking outside mother's apartment when the building manager joined them. The manager had multiple problems with mother and concerns about the children. The manager had to tell mother on a weekly basis to get the children out of the window because they could fall out (mother lived on the third floor). The screen had been removed from the window. Mother appeared to be in another room and not supervising the children while they were hanging in the window. The pest exterminator told the manager that mother's apartment was infested with roaches, but mother refused to allow the exterminator access. The exterminator felt it would take multiple visits to clear the apartment of roaches and eggs. Mother had changed her locks and would not give the manager a key. The manager also reported mother left the children in the building courtyard unsupervised while she left the

4

building, and she had taken the batteries out of her smoke detectors or removed them from the wall.

DCFS further spoke with a neighbor who wished to remain anonymous and did not provide her name. The neighbor reported mother physically abused the children and "yell[ed] and curse[d]" at them. She had seen mother scream at Ds., pick her up by the hair, and throw her to the ground. Mother told the neighbor she only hit the children in the head so that she did not leave marks or bruises DCFS could see. After the incident with counsel's assistant, mother pointed at Dz. and told the neighbor, "This bitch right here talks to [*sic*] much," and she was about to hit Dz. before the neighbor stopped her. Mother told the neighbor she did not feed the children "because they don't need to eat." Mother also said that Dz. and Ds. were "the type that will fuck your man when they turn 12 and 13." The neighbor heard mother tell Dz. and Ds. "they are getting the fuck out of my house" when they turn that age. She also reported mother locked the children in the bedroom by blocking the door with a dresser. The neighbor felt there was "constant emotional abuse."

Mother denied abusing the children and pointed out there were no marks or bruises on them. She was "tired of people calling in referrals on her" and said people did this because they did not like her and were jealous of her. She also said the building manager knew about the roaches in her apartment but would not do anything about them because he did not like her. She denied leaving the children with a registered sex offender. DCFS detained the children on an emergency basis and was going to facilitate a visit for mother within 72 hours, but mother refused to see or speak with the social worker.

Father's location was unknown at the time and DCFS had thus not interviewed him. The court ordered DCFS to conduct a due diligence investigation into father's whereabouts. Mother and father were not married and never cohabitated.

At the detention hearing on August 13, 2013, mother requested that the children be placed with a relative caretaker. Mh. and Ma.'s counsel requested that the court not give DCFS discretion to release them to a relative. Counsel indicated her office had

5

been following the children for several years and had a "very, very high, extreme level of concern about the children in this case." The court found a prima facie case for detaining Mh. and Ma. and ordered monitored visits for mother of four hours per week at a minimum, not to take place in mother's home. The court ordered DCFS to exert its best efforts to place the children with their half siblings and place them with the former foster mother.

DCFS interviewed Dz. for the jurisdiction/disposition report, who reported the following. Mother did not grab her by the hair and throw her to the ground, but she did pull her hair and hit her with a belt and a shoe on her bottom. Mother also locked her and Ds. in their room by putting a dresser in front of the door, and mother yelled and screamed at them. Mother left them in the room by themselves where the window had no screens, and they would hang out the window.

Mother threw things when she was angry and did not clean up, telling the children to clean up. Mother reported she was a dependent of the court as a child and was born drug exposed, which caused her to have developmental delays. The owner of Life Walk Services reported that mother suffered from an intellectual disability. She thought mother had also been diagnosed as bipolar when she was younger, but she said mother was not receiving mental health services or taking psychotropic medications. The owner said mother "can turn it on and off. She will snap in a minute."

Mother denied ever physically disciplining the children, locking them in their room, leaving them unattended, and letting them play in the window. She also denied changing her locks and said she did not give the exterminator access to the apartment because he did not give her sufficient notice. The landlord was in the process of evicting mother. Life Walk Services was assisting mother in finding new housing. Mother was very guarded and would not give the regional center authorization to speak to DCFS.

DCFS also interviewed the former foster mother for Dz. and Ds., with whom all four children had then been placed. The foster mother reported they were afraid to be

in a room with the door closed, and Dz. told the foster mother that mother would barricade the children in their room with a dresser. Dz. and Ds. often had physical altercations, and once when Ds. hit Dz. on the head, Dz. said mother did that to her, too. The children said they did not wish to return to mother. Ma. had a history of rocking back and forth and hitting her head on the floor. The foster mother had observed mother arguing with Ds. during monitored visits as if mother were also a three year old. During a recent visit when Ds. said, "I want daddy" (referring to the foster father), mother replied, "So, go get daddy. You can stay with him. I don't want you anyway. I'll get rid of you until you are 18 years old."

DCFS discovered father was incarcerated at Wasco State Prison and had been since August 29, 2013. He was charged with petty theft and possession of a controlled substance. The criminal court convicted him of possession of a controlled substance and sentenced him to 16 months in state prison. The staff at the prison would not make father available for an interview until DCFS furnished a minute order from the juvenile court. Father had other convictions, including a January 2002 conviction for possession of a controlled substance (sentenced to 16 months in state prison); a December 2002 conviction for second degree robbery (sentenced to 28 months in prison); an October 2005 conviction for violating parole (sentenced to 32 months in prison); and a June 2009 conviction for possession of a controlled substance (sentenced to 3 years in prison). DCFS filed a first amended petition in October 2013 adding a section 300, subdivision (b) allegation that father had a longstanding history of criminal convictions for possession of controlled substances and was currently incarcerated.

After locating father at the prison, DCFS served him with notice of the jurisdiction hearing. There is no evidence, however, that it served him with the forms necessary to request an attorney and to request to be physically present (forms JV-450 ["Order for Prisoner's Appearance at Hearing Affecting Parental Rights"] and JV-451 ["Prisoner's Statement Regarding Appearance at Hearing Affecting Parental Rights"]).

7

Father did not appear at the jurisdiction hearing on October 23, 2013. Mother submitted a waiver of rights form and pleaded no contest. The court sustained four counts of the first amended petition, which alleged as interlineated that mother inappropriately physically disciplined Mh. and Ma.'s sibling (Ds.) by pulling her hair and striking her with a shoe and belt (a-1 count); that mother permitted Mh., at one year old, to play outside in the apartment complex and in a third story window without adult supervision (b-3 count); that Mh. and Ma.'s home was in an unsanitary condition and infested with roaches because mother refused to allow the exterminator access to the home (b-4 count); and that father had a longstanding history of criminal convictions for possession of controlled substances, including a current 16-month incarceration for possession of controlled substances (b-5 count). (The court also sustained three counts of the section 342 petition as to Dz. and Ds.)

The court scheduled a contested disposition hearing for a later date. The children's counsel filed a trial brief prior to the hearing noting that DCFS's jurisdiction/disposition report had recommended mother receive reunification services for all four children. Counsel for the children disagreed with that recommendation and requested that the court deny reunification services for all four children. Counsel argued mother had exhausted the reunification time available for Dz. and Ds., and because of the serious nature of the facts here, mother should not be provided reunification services for Mh. and Ma. under section 361.5, subdivision (b)(3) and (6). DCFS submitted a "last minute information for the court," noting that it was changing its recommendation; it agreed with the children's counsel and recommended denying reunification services.

At the first date scheduled for the disposition hearing, Attorney Renelde Espinoza made a special appearance for father. Espinoza requested a statewide removal order so that father could be present for the disposition hearing. The court granted the request and continued the matter. On the date for the continued hearing, father was not present and Espinoza again made a special appearance for him, indicating that the removal order had not been effected. The court thus continued the

8

matter to March 10, 2014, and signed another removal order. It also ordered DCFS to submit supplemental reports.

In a "last minute information for the court" dated March 4, 2014, DCFS reported mother had been visiting the children for four hours per week. The children's caregivers reported visits had been improving and mother was learning how to interact with the children appropriately. Mother said she was receiving services at the Jenesse Center for anger management, parenting, and individual counseling, but she had not attended since early February 2013. She did not provide DCFS with documentation of her attendance, and the Jenesse Center refused to provide confirmation without a release from mother.

On March 6, 2014, father submitted a "Prisoner's Statement Regarding Appearance at Hearing Affecting Parental Rights" (form JV-451) in which he indicated that he wanted an attorney appointed to represent him at the disposition hearing, but he waived his right to be physically present.

At the disposition hearing on March 10, 2014, Espinoza again specially appeared for father. It appears that Espinoza, the other parties, and the court were not aware father had submitted a statement waiving his appearance and requesting appointment of counsel. Espinoza requested another continuance because father was absent and she believed he had not waived his appearance. The children's counsel opposed a continuance because the court could not continue the disposition hearing to more than six months after the detention hearing under section 352, subdivision (b) and California Rules of Court, rule 5.550(a)(3),[3] and that six-month period had already passed. Espinoza indicated that she wished to be relieved if the court was going to decline a continuance. The court then relieved Espinoza and proceeded with the disposition hearing.

---

[3]     Further undesignated rule references are to the California Rules of Court.

DCFS requested reunification services on father's "behalf if and when he is available to receive them." The court declared Dz. and Ds. dependents of the court and terminated mother's reunification services for them under section 361.5, subdivision (b)(3) and (6), and because she had already received 18 months of reunification services. It set a permanency planning hearing for Dz. and Ds. The court also declared Mh. and Ma. dependents of the court and denied mother reunification services under section 361.5, subdivision (b)(10). The court ordered family reunification services and monitored visitation for father and set the matter for a six-month review hearing as to Mh. and Ma. Mother and father timely appealed.

**DISCUSSION**

*1. Mother's Appeal*

Mother does not challenge the jurisdictional finding as to Mh. and Ma. Instead, mother contends the court erred in denying her reunification services for them under section 361.5, subdivision (b)(10). We disagree.

Generally, parents whose children are removed from their custody receive reunification services in an attempt to eliminate the conditions that led to loss of custody and facilitate reunification of parents and children. (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) There are some circumstances, however, in which the Legislature has recognized "that it may be fruitless to provide reunification services." (*Ibid.*) Subdivision (b) of section 361.5 sets forth these circumstances in 15 statutory exceptions. "Once it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*In re Baby Boy H.*, at p. 478.)

Under section 361.5, subdivision (b)(10), reunification services need not be provided when (1) the court terminated reunification services for any sibling (including half siblings) of the child at issue because the parent failed to reunify with the sibling after he or she had been removed from the parent, and (2) the parent has not made reasonable efforts to treat the problems that led to the sibling's removal.

(*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96, 98.) We review the order denying reunification services under section 361.5, subdivision (b) for substantial evidence. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)

Mother focuses on the second prong of subdivision (b)(10). She argues no substantial evidence showed that she failed to make reasonable efforts to treat the problems leading to the siblings' (Dz. and Ds.'s) removal. The "reasonable efforts" standard is not tantamount to "cure," but the standard requires more than lackadaisical or half-hearted efforts. (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914 ["We do not read the 'reasonable effort' language in the bypass provisions to mean that *any* effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable."].)

The focus is on the extent of the parent's efforts and not whether she has achieved a certain level of progress. (*R.T. v. Superior Court, supra*, 202 Cal.App.4th at p. 914.) Still, "[i]t is certainly appropriate for the juvenile court to consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made. [¶] Simply stated, although success alone is not the sole measure of reasonableness, the *measure* of success achieved is properly considered a factor in the juvenile court's determination of whether an effort qualifies as reasonable." (*Id.* at pp. 914-915.)

In this case, substantial evidence supported the conclusion that mother had not made reasonable efforts to treat the problems leading to the siblings' removal. The siblings had been returned to mother's home in October 2012; mother received services for them from that date until the disposition hearing in March 2014 (a period of nearly 18 months). Despite this lengthy period of services, mother appeared to have made little progress in the problem areas with Dz. and Ds. Dz. and Ds. were removed because of mother's general neglect—that is, failing to feed and care for them and

11

maintaining the home in a filthy condition. There was a substantiated referral of general neglect of Mh. in January 2013. At that time, mother would not agree to voluntary family maintenance services for Mh. All four children were then removed in August 2013 for similarly neglectful conduct. For example, mother left the very young children alone while she went out, allowed them to play in third story windows unsupervised, locked them in a bedroom with a dresser to block the door, and allowed the home to be infested with roaches because mother would not allow the exterminator access. There was also evidence she did not feed them regularly. Mother appeared to have a chronic problem with neglecting the children that dated back to the three substantiated referrals in 2010 alleging mother locked one-year-old Dz. in the bedroom, did not provide diapers for Dz. and Ds. or did not change their diapers, and did not feed them. While mother's lack of progress is not dispositive, it is a telling, relevant factor. Her reoffending demonstrates that she certainly did not make the most of the in-home parenting and life counseling she was receiving.

Additionally, there was evidence that this lack of progress was because mother's efforts were half-hearted or lackadaisical. Mother's worker from Life Walk Services described her as lazy, and she often missed appointments with him. She was not cooperative with the assistant for Dz. and Ds.'s attorney when the assistant visited the home. When the assistant asked questions relating to the children's welfare, mother became aggressive, cursed at the assistant, and threw her out of the home. Mother also was not cooperative with DCFS. She was guarded and did not allow the regional center to communicate with DCFS. Mother reported in March 2014 that she was receiving services through the Jenesse Center, but she had not been since February 2013. She also would not permit DCFS to get information from the Jenesse Center to gauge her progress, if any. Moreover, there was no evidence mother accepted responsibility for the problems with the children. She denied any neglectful conduct as well as the sustained allegations of inappropriate physical discipline, even though multiple individuals reported observing neglectful conduct and inappropriate physical discipline. She asserted the referrals were caused only by other's jealousy of her. In

12

total, the evidence was ample that mother had not made reasonable efforts and her attempts to comply with services were half-hearted, at best.

Mother's attempt to rely on *In re Albert T.* (2006) 144 Cal.App.4th 207 is unavailing. In that case, the court held the evidence was insufficient to support a finding that the parent had not made reasonable efforts to treat the problems underlying a sibling's removal. (*Id.* at p. 210.) *Albert T.* did not involve a reoccuring problem that led to removal. Albert's sibling had been removed for the parent's inability to "cope" with the sibling's mental and emotional problems, and the parent received services to treat that inability. (*Id.* at p. 219.) Albert was later removed for an entirely different reason—domestic violence issues. Thus, the new sustained allegations relating to domestic violence were not evidence that the parent had failed to make reasonable efforts to treat the prior problem (an inability to cope with mental and emotional problems). (*Id.* at p. 220.) The parent had the right to services for this different problem. Here, by contrast, the problems that led to Dz. and Ds.'s removal were some of the same problems that reoccurred with Mh. and Ma.

## 2. Father's Appeal

Father contends we must reverse because (1) he did not receive proper notice of the jurisdiction hearing and the court then proceeded with the hearing in his absence, and (2) the court failed to appoint him counsel at the disposition hearing. We disagree that these asserted errors require reversal.

### A. Jurisdiction Hearing

In any proceeding under section 300, "where the proceeding seeks to adjudicate the child of a prisoner a dependent child of the court," the court "shall order notice of any court proceeding regarding the proceeding transmitted to the prisoner." (Pen. Code, § 2625, subd. (b).) Notice is required for jurisdictional and dispositional hearings, among others. (*In re Jesusa V.* (2004) 32 Cal.4th 588, 599, fn. 2) In effectuating the notice provisions, rule 5.530 requires the court to attach forms JV-450 and JV-451 to the notice of hearing, allowing the prisoner to request to be present at the hearing, to waive his or her presence, and to request counsel. (Rule 5.530(f)(5).)

13

The court may not adjudicate the dependency petition without the presence of *both* the prisoner *and* his or her counsel unless the prisoner has knowingly waived the right of physical presence. (Pen. Code, § 2625, subd. (d); *In re Jesusa V., supra*, at pp. 621-622.) We apply a familiar harmless error standard when a court erroneously proceeds in the prisoner's absence but with counsel present. (*In re Jesusa V.*, at pp. 624-625.) That is, we ask whether it is reasonably probable the appellant would have obtained a more favorable result absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *In re Jesusa V.*, at p. 625.)

While the record shows father received notice of the jurisdiction hearing, father argues notice was defective because he did not receive a copy of the first amended petition[4] or forms JV-450 and JV-451. He further argues the court erred in proceeding without him and his counsel or a waiver of his presence. Father contends we must apply the "harmless beyond a reasonable doubt" standard for errors in providing notice, *In re Daniel S.* (2004) 115 Cal.App.4th 903, 913, not the *Watson* standard for errors relating to the right to be present.

We agree notice to father was defective in that it did not include all the pertinent documents, and the court should not have proceeded in his absence without a waiver. But under any standard, we cannot say there was prejudicial error. Father does not identify how the outcome of the jurisdiction hearing would have changed, had he received proper notice and been present with counsel. He refers vaguely to a "possible challenge" to the allegations against him without explaining further. The sustained count against him alleged he had a long history of criminal convictions for possession of controlled substances, and he was incarcerated on a 16-month sentence for his most recent conviction. Father does not argue a lack of substantial evidence to support these sustained allegations. He does not argue he did not, in fact, have a history of such convictions, or that he was not, in fact, incarcerated. He does not argue

---

[4] Father appears to have received a copy of the original petition.

14

that such allegations could not support jurisdiction, and indeed they could. (*In re James C.* (2002) 104 Cal.App.4th 470, 483-484 [substantial evidence supported jurisdiction under § 300, subd. (b) when father was incarcerated and there was no evidence he made efforts to even inquire about the children much less arrange for their care, while they lived in an extremely unsanitary environment with their mother].) We see nothing to show prejudice on this record and decline to reverse.

B. *Disposition Hearing*

By the time of the disposition hearing, father had received the requisite forms, and he had submitted the form waiving his physical presence but requesting appointment of counsel. For whatever reason, it appears the court and the parties were unaware of his requests. Father was represented through the "special appearance" of Attorney Espinoza at the hearing. Espinoza requested a continuance because she (erroneously) believed father wanted to be present. The court properly declined to grant the continuance because it absolutely could not hold the disposition hearing more than six months after the detention hearing. (§ 352, subd. (b);[5] *D. E. v. Superior Court* (2003) 111 Cal.App.4th 502, 512-513 [absolute time requirement for disposition hearing under § 352 takes precedence over prisoner parent's right to be present].) Espinoza asked to be relieved if the court did not grant a continuance. The court complied and relieved her.

Father contends the court erred because it denied him due process by failing to appoint counsel and then proceeding without his counsel. Preliminarily, we note that what actually occurred was more complicated than a simple failure to appoint counsel. The circumstances hint at invited error. "'Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error.'" (*In re G.P.* (2014) 227

---

[5]     Section 352 states in pertinent part: "In no event shall the court grant continuances that would cause the hearing pursuant to Section 361 to be completed more than six months after the hearing pursuant to Section 319."

Cal.App.4th 1180, 1193.) The court had no choice but to conduct the disposition hearing under the time limits of section 352. Father was represented by Espinoza. Espinoza requested that she be relieved. She implicitly invited the court to proceed without counsel, knowing father was not present. Though father argues Espinoza was only making a special appearance for him, she was not merely objecting to jurisdiction, which is the sole purpose of a special appearance. (2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 205, p. 814.) The court had decided jurisdiction months earlier and had moved on to the disposition at this hearing. Any assertion of lack of jurisdiction would have been moot at that point.

For the sake of argument, however, we will assume the court erred in relieving Espinoza and proceeding without counsel for father. Father argues this error was structural and thus reversible per se, but none of the authorities father cites determined that the error that occurred here was reversible per se. Moreover, our Supreme Court has cautioned against importing wholesale or unthinkingly "the structural error doctrine that has been established for certain errors in criminal proceedings . . . into the quite different context of dependency cases." (*In re James F.* (2008) 42 Cal.4th 901, 915-916.) Father's undeveloped argument has not persuaded us to find structural error applicable.

Assuming that any error was of a constitutional dimension, as father suggests, and "the harmless beyond a reasonable doubt" standard applies, we still find the error not prejudicial. Father was not denied reunification services like mother. DCFS requested reunification services for father, and the court granted them, as well as visitation. Father contends the outcome of the hearing could have been more favorable because he could have gained custody of the children under section 361.2 by making appropriate arrangements for their care. This argument is unpersuasive.

Under section 361.2, when a court orders removal of a dependent child from the custodial parent and the noncustodial parent requests custody, "the court shall place the child with the [noncustodial] parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of

16

the child." (§ 361.2, subd. (a).) The court must make the detriment finding under section 361.2 by clear and convincing evidence. (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 295 (*D'Anthony D.*).)

Under section 361, the court shall not take physical custody of a dependent child from the custodial parent "unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

Here, the court made findings at the disposition hearing under section 361 as to *both* parents, even though mother was the only custodial parent. Specifically, the court found: "The court does find by clear and convincing evidence that there is a substantial danger if the children were to be returned to the *parents* and that there are no reasonable means by which the child's -- the children's physical and emotional health can be protected without removing them from the *parents*. [¶] The court orders the children removed from the *parents*." (Italics added.) Because father did not have physical custody of Mh. and Ma., by its terms, section 361 did not apply. Section 361.2, on its face, would have applied to any request for custody by father.

While the court's findings under section 361 as to father—a noncustodial parent—did not comport with the language of section 361.2, we should "neither ignore the similarity between these statutes' mandatory findings, nor disregard the evidence supporting the court's 'substantial danger' finding concerning placement with father." (*D'Anthony D., supra*, 230 Cal.App.4th at p. 303.) Surely a finding of substantial danger to the children's physical and emotional health (§ 361) is akin to a finding of detriment to their physical and emotional health (§ 361.2). Given father's criminal history and latest incarceration, and the court's express finding under section 361 of substantial danger to the children's physical and emotional health, we cannot say the

17

court would have granted any request for custody by father under section 361.2. (*D'Anthony D., supra*, at pp. 303-304.)  In short, there was no prejudicial error.[6]

## DISPOSITION

The order is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.

---

[6]    Both father and DCFS assume without discussing that father could request custody under section 361.2 as an offending parent.  The plain language of section 361.2 does not impose a requirement that the noncustodial parent also be nonoffending.  Still, some courts have implied a nonoffending requirement into the statute, while others have refused to find such a requirement.  (Compare, e.g., *In re A.A.* (2012) 203 Cal.App.4th 597, 602, 606-608, with *D'Anthony D., supra*, 230 Cal.App.4th at p. 301.)  We need not decide the question, in view of our holding that if section 361.2 applied, no prejudicial error occurred.